**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION AT DAYTON**

| | | |
|---|---|---|
| WEIJIE LU, | : | |
| | : | |
| Plaintiff, | : | Case No. 3:22-cv-92 |
| | : | |
| v. | : | Judge Thomas M. Rose |
| | : | |
| UNIVERSITY OF DAYTON, | : | Magistrate Judge Caroline H. Gentry |
| | : | |
| Defendant. | : | |

---

**ENTRY AND ORDER GRANTING, IN PART, DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT (DOC. NO. 12); GRANTING SUMMARY
JUDGMENT FOR DEFENDANTS ON COUNTS I AND II; DECLINING TO
EXERCISE SUPPLEMENTAL JURISDICTION OVER COUNT III AND,
THEREFORE, DISMISSING THAT CLAIM WITHOUT PREJUDICE TO
REFILING IN STATE COURT; AND TERMINATING THE CASE**

---

This case involves claims by a former adjunct professor against his prior employer.
Plaintiff Weijie Lu ("Lu" or "Plaintiff") brings three claims against the University of Dayton
("UD" or "Defendant"): (1) Title VII Race & National Origin Discrimination; (2) Title VII
Retaliation; and (3) promissory estoppel. (Doc. No. 1.) Pending before the Court is UD's Motion
for Summary Judgment (Doc. No. 12) (the "Motion"). In the Motion, UD moves for an order
granting summary judgment on all claims against it, pursuant to Federal Rule of Civil Procedure
56. For the reasons explained below, the Court **GRANTS, IN PART,** the Motion. The Court
grants summary judgment to UD on Counts I and II of the Complaint and declines to exercise
jurisdiction over Count III. Therefore, Count III is dismissed without prejudice to refiling in state
court, and this case shall be terminated.

I. **BACKGROUND** [1]

A. **Lu's History at UD and Complaint to UD Regarding a Former Graduate Student**

Lu is an Asian American of Chinese descent. (Doc. No. 1 at PageID 3; Doc. No. 6 at PageID 24.) He served as an adjunct professor for UD's Physics Department, where he taught one or two sections of physics courses each semester between 2014 and the 2020 Spring semester. (Doc. No. 9-1 at PageID 55; Doc. No. 6 at PageID 24.) UD hired adjunct professors, like Lu, on a part-time, per semester basis, as needed. (Doc. No. 9-1 at PageID 55; Doc. No. 20 at PageID 161-63, 189.) An adjunct professor's obligations end at the conclusion of each teaching semester. (*Id.*) Such hiring was based on projected student enrollment for the semester and whether there was funding to hire an adjunct professor. (*Id.*)

Between 2012 and 2014, Lu was an advisor to Sorrie Ceesay ("Ceesay"), who was pursuing his Ph. D. at UD. (Doc. No. 1 at PageID 3.) Lu had previously served as Ceesay's advisor for Ceesay's masters program work at Fisk University. (*Id.*) Ceesay is an African American. (*Id.*; Doc. No. 6 at PageID 24.) Ceesay's Ph. D. research was funded through the Defense Associated Graduate Student Innovators program ("DAGSI"). (*Id.*) DAGSI is an Ohio program funded by the Ohio Department of Higher Education and the United States Air Force that supports science and engineering graduate students and faculty who conduct research in areas targeted by the Air Force Research Laboratory ("AFRL") at Wright Patterson Air Force Base ("WPAFB"). The DAGSI program requires the research work be awarded to students who are U.S. citizens. (*Id.*) Students and faculty at UD may be eligible to participate in the program. (*Id.*)

On January 28, 2020, several years after serving as Ceesay's advisor, Lu sent an email to

---

[1] For purposes of resolving the Motion, the recitation in the "Background" section includes undisputed facts and otherwise assumes the evidence of the non-moving party as true and draws all reasonable inferences in the nonmoving party's favor, as is appropriate at this stage. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Tolan v. Cotton*, 572 U.S. 650, 660 (2014).

UD's Equity Compliance office to report alleged discrimination against Ceesay on the basis of his

race (the "Ceesay Complaint"). (*See* Doc. No. 8-1 at PageID 47-48; Doc. No. 21 at PageID 209-

10.) That email stated, in part:

> I am emailing you about the civil rights violation on a UD student, Mr. Sorrie
> Ceesay, at AFRL/RXAN … at Wright-Patterson AFB, when he was a Ph.D student
> at UD and worked at AFRL/RXAN for his Ph. D thesis.
>
> Mr. Sorrie Ceesay was a Ph.D. student in materials engineering at UD. I was his
> advisor for his M.S. degree in chemistry at Fisk University, and then his technical
> advisor for his Ph.D thesis at AFRL/RXAN after he enrolled at the University of
> Dayton in 2012. … I have prepared his Ph.D thesis research plan with Prof
> Browning, and his research project was funded by the DASIG (Defense Associated
> Graduate Student Innovators) program in 2013-14 and 2014-15. …
>
> Only US citizens can apply for the DASIG program. Mr. Ceesay became a US
> citizen in 2011. However, RXAN stated that the cause of his termination in 2014
> was that he is not a[] US citizen. Mr. Ceesay is an African American, and he was
> in good academic standing with [a] 3.4 GPA and passed his Ph.D candidacy
> examination at the University of Dayton, and his Ph.D thesis research was in an
> active funded DASIG project. There was no reason to terminate him.
>
> The termination of [Ceesay] was a typical Jim Crow civil rights violation and a
> constitutional violation, and it was at US Air Force in 2014. … [Through a FOIA
> report in June 2019,] I found that the cause of [Ceesay's termination] in 2014 at
> AFRL/RX [was] 'the removal of all green card holders from AFRL facilities.' In
> fact, [Ceesay] became a US citizen in 2011.
>
> All of us have obligations to protest such illegal conduct by AFRL/RXAN and
> support students. …
>
> In this case, AFRL/RXAN has violated all principles in social justice: equity,
> access, participation, and rights on a UD minority student. The racism at
> AFRL/RXAN has destroyed Mr. Ceesay's life and career! He was a full time UD
> student when he was attacked by the racists at W-P AFB in 2014. I believe that the
> university, faculty, and staffs have legal and moral obligations to protest the racism
> and to support him! …

(Doc. No. 8-1 at PageID 47.) In response to the Ceesay Complaint, Kimberly Bakota ("Bakota"),

UD's Equity Compliance Officer, sent an email on January 30, 2020 informing Lu that,

"[u]nfortunately, the University is not able to advise you or Mr. Ceesay on issues pertaining to

potential claims against AFRL/RXAN, WPAFB, or other institutions" and that his "best source of

3

information would be from the local field office of the" Equal Employment Opportunity Commission ("EEOC"). (*Id.*) Bakota testified that UD did not open a comprehensive investigation in response to the Ceesay Complaint; instead, UD investigated whether it had jurisdiction over the matter and whether the allegations presented to UD could constitute a violation of its policy. (Doc. No. 21 at PageID 210-11.) Bakota determined that UD did not have jurisdiction regarding the Ceesay Complaint "because the respondent … would be the Air Force research lab." (*Id.*)

On February 7, 2020, Scott Segalewitz ("Segalewitz"), UD's Associate Dean for Experimental Learning and Student Success, sent an email to Bakota and others—including Lu— in which he informed them that Lu "just called and gave me an earful" and "wants to know what the student needs to do to complete his PhD." (Doc. No. 8-1 at PageID 42, 47.) The email continued:

> I told [Lu] several times that I could not talk to him because of FERPA [Family Educational Rights and Privacy Act] laws. If the student wants to come back, he needs to talk with his Department Chair. I do not have any sense that the student and Mr. Liu [sic] have had any interaction. Mr. Li [sic] kept saying that he wants to get the information to pass along to the student. Mr. Lu did not like my responses and said he was going to call the Provost. Good Luck, Paul.

(*Id.*) Several months later, on July 19, 2020, Lu referred to Segalewitz's use of the phrase "an earful" as racist. (Doc. No. 8-1 at PageID 42.) Bakota and UD's Office of Equity Compliance "could not foresee how Mr. Segalewitz's use of a word that is not tied to any particular race and that simply means Dr. Lu was talkative could be viewed as a violation of" UD's Nondiscrimination and Anti-Harassment Policy and, therefore, Bakota determined that the office "did not need to conduct an investigation into Dr. Lu's characterization of Mr. Segalewitz's response." (*Id.*)

**B. 2020 Fall Semester Physics Job at UD**

Back in January 2020, John Erdei ("Dr. Erdei"), the Chair of the Physics Department at

4

UD, contacted Lu and asked him if he could teach two Physics classes at UD for the 2020 Fall semester (the "2020 Fall Semester Physics Job"). (Doc. No. 20 at PageID 167-68.) However, in March of 2020, Ohio Governor Mike DeWine required universities to send their students home because of the COVID-19 pandemic. (Doc. No. 9-1 at PageID 56.) In April of 2020, 60 UD employees had their positions eliminated and close to 450 employees were furloughed. (*Id.*) At the same time, academic units at UD were instructed to put all adjunct professor decisions for the 2020 Fall semester on hold. (*Id.*) That same month, Dr. Erdei explained to Lu that there was a spending freeze and a hiring freeze at UD, resulting in a holding pattern regarding the 2020 Fall semester. (*Id.*) When student enrollment began in mid-spring of 2020, Lu was listed as the teaching professor for the two Physics classes; there was preliminary budget approval for the position, but no contract had been issued to Lu and the decision on whether to actually approve issuing contracts would not happen until July. (Doc. No. 20 at PageID 169-70.)

Members of UD's upper administration were having meetings about the pandemic, including ensuing budget problems. (Doc. No. 20 at PageID 171, 173.) Student enrollment in a class taught by a tenure-track, full time professor who taught the same Physics class that Lu historically taught was extremely low. (*Id.* at PageID 173-74.) By July of 2020, Dr. Erdei was to redistribute the Physics courses among existing full-time faculty, which he did. (Doc. No. 9-1 at PageID 56.) This was done because of budgetary concerns, given that using professors who were already part of the budget would avoid a need to increase the budget. (Doc. No. 20 at PageID 173-75.) Dr. Erdei was able to meet the course needs in the Physics department with existing full-time faculty and, therefore, UD did not need Lu—or any adjunct professors—for the 2020 Fall semester in the Physics department (or, as it turned out, the 2021 Spring semester). (Doc. No. 9-1 at PageID 57; Doc. No. 20 at PageID 166-67.) That same month, UD decided not to approve issuing a

contract for Lu to be an adjunct professor for the 2020 Fall semester. (Doc. No. 20 at PageID 165, 170.)

A visiting professor, who had been hired in 2019 to cover the workload for a faculty member who was on a two-year fellowship in Europe, taught during the 2020 Fall semester along with the full-time, tenure-track faculty members. (Doc. No. 20 at PageID 190-93.) The hiring process for visiting professors involves a search that is the same as full-time, tenure-track faculty members. (*Id.*)

On July 10, 2020, Dr Erdei informed Lu that he did not have approval to renew Lu teaching's contract for the 2020 Fall semester due to the uncertainties regarding the semester, by which Dr. Erdei testified that he meant the continued uncertainties because of the pandemic. (Doc. No. 9-1 at PageID 57.) In response, Lu said in an email on July 16, 2020 that he wanted to schedule a telephone meeting and also mentioned civil rights violations against a student and some planned next steps. (*Id.*)

### C. Full-Time Professor Position at UD

Dr. Erdei then encouraged Lu to apply for full-time positions within UD. (Doc. No. 1 at PageID 6; Doc. No. 6 at PageID 26.) In February of 2021, Lu applied for a full-time faculty position at UD, specifically an associate professor position in UD's Electro-Optics and Photonics department (the "Photonics Job"). (Doc. No. 1 at PageID 6.) UD formed a search committee to screen applicants for the Photonics Job. (Doc. No. 10-1 at PageID 70-71.) Among the minimum qualifications listed for the position were "[a] very good record of refereed journal and conference publications." (Doc. No. 23-3 at PageID 268.)

UD eliminated Lu for the Photonics Job during the initial screening because, according to UD, he did not meet the minimum job qualifications. (Doc. No. 22 at PageID 234-35.) UD selected Swapnajit Chakravarty ("Chakravarty"), a man of Indian descent, for the Photonics Job.

6

(*Id.*; Doc. No. 23 at PageID 248.)

### D. Charges, Complaint, and Current Motion

Prior to commencement of this lawsuit, Lu filed charges with the Ohio Civil Rights Commission ("OCRC") and the EEOC. (Doc. No. 1-1.) Lu received right-to-sue notices from the OCRC and EEOC. (Doc. No. 1-1.) On April 8, 2022, Lu filed this action. (Doc. No. 1.) Soon thereafter, on June 13, 2022, UD filed the Motion. (Doc. No. 12.) The parties then agreed to conduct limited discovery to allow Lu to properly respond to the Motion. (Doc. No. 14 at PageID 105; 07/13/2022 Notation Order.) On September 22, 2022, Lu filed a response in opposition to the Motion (Doc. No. 23) (the "Opposition"), to which UD filed a reply (Doc. No. 26) (the "Reply"). The Motion is fully briefed and ripe for review and decision.

## II. LEGAL STANDARDS FOR SUMMARY JUDGMENT

Rule 56 of the Federal Rules of Civil Procedure provides that "[a] party may move for summary judgment, identifying each claim or defense--or the part of each claim or defense--on which summary judgment is sought" and that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Alternatively, summary judgment is denied "[i]f there are 'any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.'" *Hancock v. Dodson*, 958 F.2d 1367, 1374 (6th Cir. 1992) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)).

The party seeking summary judgment has the initial burden of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, that it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see also* Fed. R. Civ. P. 56(a), (c). In opposing summary judgment, the nonmoving party cannot

rest on its pleadings or merely reassert its previous allegations. *Anderson*, 477 U.S. at 248-49. It also is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The nonmoving party must "go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. *Celotex Corp.*, 477 U.S. at 324.

A party's failure "to properly address another party's assertion of fact as required by Rule 56(c)" can result in the court "consider[ing] the fact undisputed for purposes of the motion." Fed. R. Civ. P. 56(e). Additionally, "[a] district court is not ... obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

In ruling on a motion for summary judgment, it is not the judge's function to make credibility determinations, "weigh the evidence[,] and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249, 255. In determining whether a genuine issue of material fact exists, the court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in that party's favor. *Id.* at 255; *Matsushita*, 475 U.S. at 587; *Tolan v. Cotton*, 572 U.S. 650, 660 (2014). However, the "mere existence of a scintilla of evidence in support of the" nonmoving party is not sufficient to avoid summary judgment. *Anderson*, 477 U.S. at 252. "There must be evidence on which the jury could reasonably find for the plaintiff." *Id*. The inquiry, then, is "whether reasonable jurors could find by a preponderance of the evidence that the" nonmoving party is entitled to a verdict. *Id*.

**III.  <u>ANALYSIS</u>**

UD argues that it is entitled to summary judgment on each of Lu's three claims. Lu disagrees and asks that the Court deny the Motion.

8

A.  **Title VII Race & National Origin Discrimination (Count I)**

In Count I of the Complaint, Lu alleges that he was discriminated against by UD because he is of Chinese descent; he was qualified for his job as an adjunct Physics professor and the full-time Photonics Job for which he applied; he was terminated from his adjunct professor job and rejected for the Photonics Job; UD hired someone outside of Lu's protected class for his adjunct professor job and the Photonics Job; UD treated similarly-situated co-workers and applicants outside of his protected class differently, including by allowing Lu's research to be plagiarized and published without recourse; and he suffered damages as a result of UD's conduct.  (Doc. No. 1 at PageID 8-9.)  Thus, Lu asserts a Title VII discrimination claim regarding both the 2020 Fall Semester Physics Job and the Photonics Job.

Title VII of the Civil Rights Act of 1964 prohibits an employer from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).  A Title VII plaintiff "may establish a claim of discrimination either by introducing direct evidence of discrimination or by presenting circumstantial evidence that would support an inference of discrimination." *Laster v. City of Kalamazoo*, 746 F.3d 714, 726 (6th Cir. 2014).  No party argues that this is a direct evidence case.

Regarding establishing a claim of discrimination indirectly by circumstantial evidence, a plaintiff "first carries the burden of establishing a *prima facie* case." *Laster*, 746 F.3d at 727.  To establish a *prima facie* case, a plaintiff must show that he or she (1) is a member of a protected class; (2) was qualified for the position and performed it satisfactorily; (3) suffered an adverse employment action; and (4) was replaced by a person outside of the protected class or was treated less favorably than a similarly-situated individual outside of the protected class.  *Id.*; *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 572-73 (6th Cir. 2000).  If the plaintiff is able to do so, then a

mandatory presumption of discrimination is created and the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the rejection. *Johnson*, 215 F.3d at 573. "If the defendant carries this burden, then the plaintiff must prove that the proffered reason was actually a pretext to hide unlawful discrimination." *Id.* The plaintiff may establish that the proffered reason was a mere pretext by showing that (1) the stated reason had no basis in fact; (2) the stated reason was not the actual reason for the rejection; or (3) the stated reason was insufficient to explain the defendant's action. *Id.*

UD makes three overarching arguments to support its request for summary judgment on Lu's discrimination claim. (*See* Doc. No. 12 at PageID 90-94.) First, UD argues that Lu failed to exhaust his administrative remedies with respect to the failure to hire portion of this claim (i.e., the Photonics Job). Second, UD argues that Lu cannot establish a *prima facie* case of Title VII discrimination because he cannot establish that he was qualified nor can he show that he was treated differently than a similarly-situated, non-protected employee. Third, UD argues that Lu cannot establish that its stated reason for not renewing him as an adjunct professor was simply pretext.

The Court addresses only the second argument—that Lu cannot establish a *prima facie* case of Title VII discrimination—because it is dispositive. For purposes of deciding the Motion concerning Count I, and without addressing or deciding whether Lu exhausted his administrative remedies to sue on claims of race and national original discrimination with respect to UD's rejection of his application for the full-time Photonics Job, the Court will simply assume that Lu exhausted his administrative remedies.

### (1) 2020 Fall Semester Physics Job

UD argues that, with respect to the 2020 Fall Semester Physics Job, Lu cannot establish that he was qualified for the position nor can he show that UD treated him differently than a

similarly-situated, non-protected employee and, therefore, cannot make a *prima facie* showing of race and national original discrimination regarding that position.  (Doc. No. 12 at PageID 93.)  The Court need only address the latter argument.

As indicated above, the fourth requirement for a *prima facie* case is that a plaintiff must show that he or she was replaced by a person outside of the protected class <u>or</u> was treated less favorably than a similarly-situated individual outside of the protected class.  Lu does not attempt to demonstrate the first option, <u>i.e.</u>, that the person replacing him was outside of the protected class.   Instead, he argues that he "was treated differently than similarly situated visiting professors."  (Doc. No. 23 at PageID 252-53.)  However, the Court disagrees that Lu (an adjunct professor) was similarly-situated to the single visiting professor who taught in the Physics Department in the 2020 Fall semester.

Courts "consider individuals to be similarly situated if they are similar (though not identical) in all relevant respects."  *Lynch v. ITT Educ. Servs., Inc.*, 571 F. App'x 440, 444 (6th Cir. 2014) (citing *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 353 (6th Cir. 1998)); *see also McNeil v. Sonoco Products Co.*, 519 F. App'x 382, 383 (6th Cir. 2013) (plaintiff "could satisfy the fourth prima facie element by proffering evidence 'that a comparable non-protected person was treated better' in all relevant respects") (quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582-83 (6th Cir. 1992)).  The court's "task is to make an individualized determination of which factors are relevant based on the factual context of the case."  *Lynch*, 571 F. App'x at 444 (citing *Erecgovich*, 154 F.3d at 352).  For example, "[d]ifferences in job title and responsibilities, experience, and disciplinary history may establish that two employees are not similarly situated." *Campbell v. Hamilton Cnty.*, 23 F. App'x 318, 325 (6th Cir. 2001).

The Court finds that the visiting professor who worked in the Physics Department during

11

the 2020 Fall semester is not a suitable comparator because he was not a similarly-situated individual. That professor was a visiting professor, not an adjunct professor, who was hired back in 2019 (pre-pandemic) to cover the workload of a faculty member on a two-year fellowship in Europe. (Doc. No. 20 at PageID 190-93.) Additionally, visiting professors can conduct research through the department in which they teach and are hired through a search committee. (*Id.*) The employment process for visiting professors is different from that of adjunct professors (who are hired on a part-time, per semester basis). (*Id.* at PageID 161-63, 189-93; Doc. No. 9-1 at PageID 55.) In short, the visiting professor and adjunct professor positions are materially different in the context of this case. *Lynch*, 571 F. App'x at 444 (concluding that there was no genuine issue of material fact that plaintiff failed to establish the fourth element of his *prima facie* case of race discrimination; although the individual outside of the protected class was similarly situated in some relevant respects, he was not similarly situated in all relevant respects). Furthermore, UD did not hire (or offer a contract to) any adjunct professors for the 2020 Fall semester in the Physics Department, and Lu has set forth no evidence demonstrating otherwise. (Doc. No. 20 at PageID 189; Doc. No. 9-1 at PageID 56-57.)

Therefore, UD is granted summary judgment on Lu's claim of Title VII Race & National Origin Discrimination with respect to the 2020 Fall Semester Physics Job. There is no genuine issue of material fact, and UD is entitled to judgment as a matter of law.

### (2) **Photonics Job**

With respect to the Photonics Job, UD argues that Lu cannot establish that he was qualified for the position and, therefore, cannot make a *prima facie* showing of race and national original discrimination regarding that position. (Doc. No. 26 at PageID 300.)

As indicated above, the second requirement for a *prima facie* case is that a plaintiff must show that he or she was qualified for the position and performed it satisfactorily. To establish that

he was qualified for the full-time Photonics Job, Lu need only show that he satisfied UD's "objective qualifications." *Upshaw v. Ford Motor Co.*, 576 F.3d 576, 585 (6th Cir. 2009) (internal quotation marks omitted).

As Lu acknowledges, one of the minimum requirements for the position was "[a] very good record of referred journal and conference publications." (Doc. No. 23 at PageID 248; Doc. No. 23-3 at PageID 268.) UD eliminated Lu for the position during the initial screening process because he did not meet that requirement.[2] (Doc. No. 23 at PageID 248; Doc. No. 22 at PageID 234-35; Doc. No. 10-1 at PageID 71-72.) Andrew Sarangan, the Chair of UD's Department of Electro-Optics and Photonics, explained that the search committee had determined that the requirement would be met if the applicant authored or co-authored an average of at least one top journal paper (or patent) per year in the last three years. (Doc. No. 10-1 at PageID 71.) Dr. Sarangan further explained that "Lu did not list any publications he had authored or co-authored within the last five years" and "did not list any recent patents—only two from 2004." (*Id.*) Accordingly, Lu failed to meet the minimum requirement for the position. (*Id.*)

In his Opposition, Lu merely asserts—without any factual citation—that he "met the minimum qualifications for the Photonics job because he holds a Ph.D. in Physics and had a successful record of teaching and mentoring students at UD" and he "submitted his resume documenting his many published journal articles and research." (Doc. No. 23 at PageID 253.) However, these conclusory allegations are insufficient to create a genuine issue of material fact. Again, the party opposing summary judgment must "go beyond the [unverified] pleadings" and present some type of evidentiary material in support of his position; Lu did not. *Celotex Corp.*, 477 U.S. at 324; *see also Mitchell*, 964 F.2d at 584-85 (statements in plaintiff's affidavit were

---

[2] UD also eliminated 29 other candidates during the initial screening process. (Doc. No. 10-1 at PageID 71-72.)

"nothing more than rumors, conclusory allegations and subjective beliefs" and, thus, wholly insufficient evidence); *McNeil*, 519 F. App'x at 383-84 (summary judgment for defendant affirmed where plaintiff "failed to proffer any evidence that a similarly situated employee outside of his protected class was treated more favorably and instead relied—impermissibly—on argument and the allegations in his complaint"). Moreover, even if the conclusory allegations were supported by evidence, they do not demonstrate that Lu authored or co-authored an average of at least one top journal paper (or patent) per year in the last three years. (Doc. No. 10-1 at PageID 71.)

Instead of showing that he satisfied UD's objective qualifications, Lu attacks the qualifications of the person UD hired for the Photonics Job (Chakravarty), arguing that this person "also did not meet the minimum qualifications because [he] did not have any teaching experience." (Doc. No. 23 at PageID 248.) However, Lu is mistaken. (*See, e.g.,* Doc. No. 25 (Chakravarty "[h]as taught with Ray Chen," is or was a "[s]ub teacher," etc.).) Plus, the "mere existence of a scintilla of evidence in support of the" nonmoving party is not sufficient to avoid summary judgment. *Anderson*, 477 U.S. at 252. "There must be evidence on which the jury could reasonably find for the plaintiff," and here such evidence simply is not present. *Id.*

There is no genuine issue of material fact, and UD is entitled to judgment as a matter of law on Lu's claim of Title VII Race & National Origin Discrimination with respect to the Photonics Job as well. The Court grants summary judgment for UD on Count I of the Complaint.

### B. Title VII Retaliation (Count II)

Title VII also prohibits an employer from retaliating against an employee because of the employee's assertion of his or her Title VII rights. 42 U.S.C. § 2000e-3; *Fort Bend Cnty. v. Davis*, --- U.S. ---, 139 S. Ct. 1843, 1846 (2019). Lu alleges that he engaged in a protected activity by filing a complaint with UD; UD was aware that he engaged in this protected activity; UD terminated his adjunct professor position and failed to hire him to a full-time faculty position; his

14

protected activity was causally connected to UD's adverse employment actions; and he suffered damages as a result of UD's conduct. (Doc. No. 1 at PageID 9.) In support of its request for summary judgment on Lu's retaliation claim, UD argues that (1) Lu did not engage in any protected activity; (2) even if he did, it was not the but-for cause of any adverse employment action; and (3) UD articulated legitimate, nondiscriminatory reasons for its actions regarding not hiring Lu for the 2020 Fall Semester Physics Job and the Photonics Job and Lu cannot rebut those reasons. (*See* Doc. No. 12 at PageID 94-97.)

"As with a Title VII discrimination claim, a Title VII retaliation claim can be established either by introducing direct evidence of discrimination or by proffering circumstantial evidence that would support an inference of discrimination." *Laster*, 746 F.3d at 730 (internal quotation marks omitted). Again, no party argues this is a direct evidence case. To establish a *prima facie* case of retaliation through circumstantial evidence, the plaintiff must show that: (1) he or she engaged in activity protected by Title VII; (2) the defendant-employer knew that the plaintiff engaged in the protected activity; (3) the defendant-employer subsequently took an adverse employment action against the plaintiff, or the plaintiff was subjected to severe or pervasive retaliatory harassment by a supervisor; and (4) there was a causal connection between the protected activity and the adverse action (or harassment). *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 595 (6th Cir. 2007); *Randolph v. Ohio Dept. of Youth Servs.*, 453 F.3d 724, 736 (6th Cir. 2006). If the plaintiff does so, then the burden of production shifts to the defendant to identify a legitimate, non-retaliatory reason for taking the adverse employment action. *Boshaw v. Midland Brewing Co.*, 32 F.4th 598, 605 (6th Cir. 2022). If the defendant does so, then the burden of production shifts back to the plaintiff to demonstrate that the defendant's proffered reason was a mere pretext for unlawful retaliation. *Id.*

"To meet [his or her] burden on pretext, the plaintiff must produce evidence sufficient that a reasonable finder of fact could reject the employer's proffered reason." *Michael*, 496 F.3d at 597. The plaintiff "can demonstrate pretext by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Id.*

### (1) 2020 Fall Semester Physics Job

Regarding the 2020 Fall Semester Physics Job, Lu argues that the protected activity he engaged in was his January 28, 2020 Ceesay Complaint. (Doc. No. 23 at PageID 255-56; Doc. No. 1 at PageID 4, 9.) The Court will assume—without actually evaluating or deciding—that Lu has established a *prima facie* case of retaliation regarding the 2020 Fall Semester Physics Job because, as explained below, Lu's claim fails at the pretext stage. *Chen v. Dow Chem. Co.*, 580 F.3d 394, 402 (6th Cir. 2009) (affirming summary judgment on Title VII retaliation claim without addressing whether plaintiff established a *prima facie* case of retaliation because plaintiff failed to create a genuine issue of material fact as to pretext); *Blackshear v. Interstate Brands Corp.*, 495 F. App'x 613, 619 (6th Cir. 2012) (skipping any analysis regarding whether plaintiff had shown a *prima facie* case of Title VII retaliation and holding that, "[e]ven assuming that [plaintiff] made out a prima facie case of retaliation, she again has not shown that [defendant's] non-discriminatory reason for firing her … was pretextual").

UD's proffered reason for not offering Lu the 2020 Fall Semester Physics Job was that, because of the COVID-19 pandemic and ensuing budget uncertainty, UD evaluated its staffing and determined that it had sufficient faculty—whose salaries were already part of the budget—to teach the 2020 Fall semester's Physics courses, so it hired no adjunct professors for the 2020 Fall semester. (Doc. No. 9-1 at PageID 55-59; *see also* Doc. No. 12 at PageID 88-89; Doc. No. 23 at PageID 246.) The Court finds that UD has identified a legitimate, non-retaliatory reason for taking

16

the adverse employment action concerning the 2020 Fall Semester Physics Job. *Boshaw*, 32 F.4th at 605. Therefore, Lu has the burden of demonstrating that UD's proffered reason was a mere pretext for unlawful retaliation. *Id.*

Lu fails to create a genuine issue of material fact or demonstrate "pretext by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Michael*, 496 F.3d at 597. Lu first asserts, without citation to any evidence, that "UD not only had funding for the fall 2020 class, but also clearly allowed non-full time faculty to teach classes." (Doc. No. 23 at PageID 254.) He then points to Dr. Erdei's admission that a visiting professor taught classes in the 2020 Fall semester and asserts (without citation to any evidence) that the visiting professor "was required to have budget approval through the budget office like adjunct professor positions." (*Id.*) However, as explained above, the visiting professor was hired back in 2019 to cover the workload of a faculty member who went to Europe for two years for a fellowship, was not an adjunct professor, and the employment process for visiting professors is different from that of adjunct professors. (Doc. No. 20 at PageID 161-63, 189-93, 190-93; Doc. No. 9-1 at PageID 55.)

Next, Lu points out that he "had been listed as the professor on two Physics classes during registration and Dr. Erdei received preliminary budget approval for Dr. Lu's adjunct position." (Doc. No. 23 at PageID 254.) However, Lu recognizes that this was "preliminary," UD informed Lu that things could change, and—perhaps not surprisingly given that the relevant events took place during the early stages of the COVID-19 pandemic—things did change. Although Lu was listed as the teaching professor for the two Physics classes when student enrollment began in mid-spring of 2020, the budget approval for the position at the time was only preliminary; no contract had been issued and the decision on whether to actually approve issuing contracts for adjunct

professors would not happen until July.  (Doc. No. 20 at PageID 169-70.)  Hiring an adjunct professor was based on projected student enrollment and whether there was sufficient funding. (Doc. No. 9-1 at PageID 55; Doc. No. 20 at PageID 161-63, 189.)  Between mid-spring 2020 and early July 2020, there were budget problems and extremely low student enrollment for at least one Physics class in the upcoming Fall semester.  (Doc. No. 20 at PageID 171-74.)

Finally, Lu argues that "UD's reason that there was no money in the budget was insufficient to motivate Dr. Lu's termination because there was no discussion with the budget office."  (Doc. No. 23 at PageID 254.)  Lu points to testimony from Dr. Erdei that he never sought guidance from the budget office to see if there was money in the budget for an adjunct professor position because shifting classes to tenured faculty did not require budget approval or denial.[3]  (Doc. No. 23 at PageID 254 (citing Doc. No. 20 at PageID 175).)  However, given the evidence and circumstances, simply because there was no discussion with the budget office does not mean that budgetary concerns were insufficient to motivate the decision not to offer Lu (or any adjunct professor) a teaching position in the 2020 Fall semester.  Dr. Erdei explained that members of UD's upper administration were having meetings about the pandemic, including regarding budget problems, and there was extremely low student enrollment for at least one Physics class in the upcoming Fall 2020 semester.  (Doc. No. 20 at PageID 171-74.)  He further explained that Physics courses were then redistributed among existing full-time faculty because of budgetary concerns, given that using professors who were already part of the budget would avoid a need to increase the budget.  (Doc. No. 9-1 at PageID 56; Doc. No. 20 at PageID 173-75.)  Lu fails to show why making this decision—which would address concerns with increasing the budget through offering a contract

---

[3] The deposition testimony actually is the following:  "Q:  Did your decision [to redistribute the classes to the tenure-track faculty members] have to be approved by the budget office?  A.  There was no budgetary part of that.  And so was it?  Again, I don't know.  I wasn't in the dean's office, but my guess is that since we were not offering a contract, there was no budget consideration."  (Doc. No. 20 at PageID 175.)

to any adjunct professor, not just Lu—would need to be discussed or approved by the budget office or, more importantly, suggests pretext.

Ultimately, the evidence supports UD's stated non-retaliatory reason for not offering Lu the 2020 Fall Semester Physics Job and, based on the evidence presented, no reasonable jury could conclude otherwise. Thus, UD is entitled to summary judgment on Lu's claim of Title VII Retaliation with respect to the 2020 Fall Semester Physics Job. There is no genuine issue of material fact, and UD is entitled to judgment as a matter of law. *Chen*, 580 F.3d at 402 (affirming summary judgment for defendant on Title VII retaliation claim because the evidence supported the defendant's claim that it terminated plaintiff for performance-related reasons and, on the record, no reasonable jury could conclude otherwise); *Brown v. VHS of Mich., Inc.*, 545 F. App'x 368, 374 (6th Cir. 2013) (affirming summary judgment for defendant on Title VII retaliation claim because plaintiff failed to produce sufficient evidence to show there was a genuine issue of material fact regarding defendant's reason for plaintiff's discharge).

### (2) Photonics Job

Regarding the Photonics Job, Lu argues that the protected activity he engaged in was filing his first charge with the OCRC (on or around January 5, 2021); that charge had alleged that UD discriminated against him because of his race and age and that he was retaliated against and threatened "for speaking out a Jim Crow civil violation on a UD student." (Doc. No. 23 at PageID 256; Doc. No. 23-4.) The Court will assume—without actually evaluating or deciding—that Lu has established a *prima facie* case of retaliation regarding the Photonics Job because, as explained below, it likewise fails at the pretext stage. *Chen*, 580 F.3d at 402.

As indicated above, UD's stated reason for not offering Lu the Photonics Job was that he did not meet qualifications for the position. (Doc. No. 10-1 at PageID 70-72.) The Court finds that UD has identified a legitimate, non-retaliatory reason for taking the adverse employment

action concerning the Photonics Job. *Boshaw*, 32 F.4th at 605. Therefore, Lu has the burden of demonstrating that UD's proffered reason was a mere pretext for unlawful retaliation. *Id.*

Lu argues that the stated reason "has no basis in fact, was insufficient to motivate Dr. Lu's rejection, and did not actually motivate Dr. Lu's rejection." (Doc. No. 23 at PageID 255.) However, Lu fails to cite any evidence to support this assertion, and there is plenty of evidence to the contrary that is set forth in the discrimination analysis above. (*See, e.g.,* Doc. No. 10-1 at PageID 71-72, Doc. No. 22 at PageID 234-35, Doc. No. 23 at PageID 248, Doc. No. 23-3 at PageID 268 (one of the minimum requirements for the position was "[a] very good record of referred journal and conference publications" and Lu did not meet that requirement).) Thus, Lu once again relies on his argument that the person UD hired for the Photonics Job (Chakravarty) "should also have been deemed unqualified because he had no teaching experience." (Doc. No. 23 at PageID 255.) The Court also addressed this argument in the discrimination analysis above. Again, Lu is mistaken. (*See, e.g.,* Doc. No. 25 (Chakravarty "[h]as taught with Ray Chen," is or was a "[s]ub teacher," etc.).) Lu "has failed to provide any evidence that the" reason UD stated for not hiring him for the Photonics Job "was merely 'pretext' to cover up a Title VII violation." *Brown*, 545 F. App'x at 374 (affirming summary judgment for defendant on Title VII retaliation claim). There is no evidence on which a jury could reasonably find for Lu on this claim. *Anderson*, 477 U.S. at 252.

As with the 2020 Fall Semester Job, Lu has failed to demonstrate (or create a genuine issue of material fact regarding) "pretext by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Michael*, 496 F.3d at 597. The evidence ultimately supports UD's stated non-retaliatory reason for not offering Lu the Photonics Job and, based on the evidence presented,

no reasonable jury could conclude otherwise. There is no genuine issue of material fact, and UD

is entitled to judgment as a matter of law with respect to the Photonics Job retaliation claim too.

Therefore, the Court grants summary judgment for UD on Count II of the Complaint. *Chen*, 580

F.3d at 402.

### C. **Promissory Estoppel (Count III)**

The last remaining count in the Complaint is a promissory estoppel claim. Lu alleges that

UD made a clear and unambiguous promise to him, informing him that he would be teaching two

Physics courses as an adjunct professor in the 2020 Fall term; he relied on that promise; it was

reasonable and foreseeable that he would rely on UD's promise, "as he had done for the prior six

years"; and he suffered damages as a result of UD's conduct. (Doc. No. 1 at PageID 410.) Lu's

promissory estoppel claim is a state law claim, and there is no argument or evidence that this Court

has original jurisdiction over it. (*See* Doc. No. 1 at PageID 1-2, 10.)

Given that the Court has granted judgment for UD on all claims in the Complaint over

which it has original jurisdiction, the Court declines to exercise supplemental jurisdiction over

Lu's last remaining claim. 28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise

supplemental jurisdiction over a claim … if … the district court has dismissed all claims over

which it has original jurisdiction"); *Harper v. AutoAlliance Int'l, Inc.*, 392 F.3d 195, 210 (6th Cir.

2004) (although dismissal is not mandatory because supplemental jurisdiction is a doctrine of

discretion, not of plaintiff's right, "[g]enerally, if the federal claims are dismissed before trial, the

state claims should be dismissed as well") (internal quotation marks omitted). Therefore, the Court

dismisses Count III of the Complaint without prejudice to refiling in state court. *Ward v. Stucke*,

No. 3:18-cv-263, 2021 WL 4033166, at *10 (S.D. Ohio Sept. 3, 2021) (after granting summary

judgment to defendants on all claims over which it had original jurisdiction, the court declined to

exercise supplemental jurisdiction over the remaining state law claims and dismissed those claims

without prejudice to refiling in state court); *Booker v. City of Beachwood*, 451 F. App'x 521, 522-23 (6th Cir. 2011) ("Once [a] district court dismisse[s] all of the claims over which it ha[s] original jurisdiction, it act[s] squarely within its discretion by declining supplemental jurisdiction over the remaining [state law] claim[s] and dismissing [them] without prejudice").

IV.      **CONCLUSION**

For the reasons stated above, the Court **GRANTS, IN PART,** Defendant University of Dayton's Motion for Summary Judgment.  (Doc. No. 12.)  The Court grants summary judgment to Defendant on Counts I and II of the Complaint; declines to exercise supplemental jurisdiction over the remaining count (Count III); and dismisses Count III without prejudice to refiling in state court.  This case shall be **TERMINATED** on the Court's docket.

**DONE** and **ORDERED** in Dayton, Ohio, this Wednesday, January 18, 2023.

s/Thomas M. Rose

_____

THOMAS M. ROSE
UNITED STATES DISTRICT JUDGE